The next case for argument is 18-2197, Centech v. United States. We're ready whenever you are. Good morning. Beth McMahon on behalf of Centech Group. May it please the Court. In light of the complexity of the cases this Court is used to hearing, this case hopefully will be refreshingly simple. It does not arise out of disputed facts, does not depend on nuances of case law or detailed regulations. It presents a very simple question, which is whether or not the government's desire for expediency can trump fundamental fairness. As a litigator, when you're – Well, the thing – one of the facts that seems compelling about this case – and we can ask your friend in the government whether they think this is dispositive – but if you had asked for this verification, whatever we want to call it, right in June at the get-go, and the government failed to respond, well, that's at least a sympathetic argument. I don't know if it's an effective legal argument, but it's like you've got one arm of the government telling you to do one thing and the other arm of the government prohibiting you from doing it. But in this case, at least the facts here seem a lot different because of the delay that the Court of Claims referred to as well in your seeking this verification from the other entities. So I know this case is predicated on fundamental fairness, but why doesn't that factor at least sort of put you on the other side of that wall? I think there are several responses to that question. First you need to look at the practicalities of what was required to bid on this. There are a lot of moving parts to that bid, a lot of them. I mean, you had to submit documentation, you had to submit contracts, you had to submit forms for each and every project. This is only one aspect of the procurement, this emerging technologies. So there were 21 different projects. And if you look at the way a contractor would put together a bid, they would sort of start at the beginning. They'd gather all the documentation. Now we didn't immediately seek the signatures when the procurement came out because you really functionally can't. You've got to compile all your paperwork. And the delay was not a dispositive factor. There's no indication that a delay would have helped things. The bid was due in October. They began to seek the signatures, which was sort of the final step of the submission, in September. You know, do I wish they had started in June? Probably. Well, did somebody, was it the Court of Federal Claims judge? Somebody seemed to, I don't want to say rest heavily, but really point out the fact that not only was there a delay, but you know, we all work in the same environment, which is end of fiscal year, September 30th, there's chaos in the federal sector. And so it wasn't just that you delayed until the last minute, but the impact was you delayed at a time where clearly, and maybe you should have known, I mean, I would recognize that this is a time where you don't want to be going into agencies and asking for stuff, right? The Court of Federal Claims mentioned it in a footnote, but it is not dispositive to the holding. And there's no indication that had more time elapsed, there would have been a different result. The contracting officer in the one case simply said, I haven't been the contracting officer for four years, and this is not a description that I wrote, so I'm not going to sign. More time wasn't going to impact that analysis. So your argument with respect to that is you were precluded, I mean, you were never going to get it under those circumstances. That's correct. These particular, time was not the problem here. The two contracting officers, for whatever reason, just refused to play ball, to sign the forms. Either because they misunderstood what it was, or they just didn't want to do it. And Centech doesn't have any ability, there's no recourse in the law, there's no avenue for them to stand up and complain. They did what any reasonable contractor would do in that circumstance, which is continue to beg, continue to email, continue to make phone calls. They did that up until the time of the documents. Well, I guess you would have no reason to know, and maybe the government will or will not, but this, do you assume this was just a one-off? Because it seems like the circumstance that was described, which is the person wasn't really around at the time or whatever, probably happens all the time in the case. Yeah, and I don't have insight into how frequent, I know that there's not another protest here, so I don't know how often that actually happened. But I think that really goes to the point of the fairness argument, is that the contractor doesn't have any control over that. Everything that the offeror had control over in this circumstance, we did appropriately. We attached all the attachments, we provided all the subcontracting plans to listen to the future argument. So you want us to effectively amend the rule, I mean, by saying that except in circumstances when the person, the bidder, exercises reasonable diligence. I don't even think the court has to go that far, Your Honor. What I think, what we are asking is that fundamental to procurement law, the government's overriding obligation is to treat everyone fairly, and the far section that kind of underlies all the more specific rules talks about how the government has to exercise discretion. The government shall exercise discretion to treat bidders fairly. In this case, Fentech, the bidder, presented the government with all the documentation of its efforts. So in that case, we're not asking for a larger rule. What we're saying is that the government presented with this weird situation, was required to do something. I'm not even saying it had to be one thing or another. They could have picked up the phone. The evaluation form notes that they knew who the contracting officers were. It responds and it explains the situations. This particular contracting officer refused to sign the form. So during evaluation, the evaluation team could have just picked up the phone. All of the things that entitled Fentech to the points, the four different attributes that enabled them to get the points, were established. And the evaluators checked the little boxes. Let me ask you, were those, you're correct about the boxes being checked on the two forms for the two contracted issues. But were those checked because the government people had done an evaluation independently or they simply checked because Fentech had put down that it met the requirements and they didn't challenge the score? In other words, were those checks in the boxes based on an independent government evaluation? Yes, the evaluators looked at everything. The reason you know that is because we cited, it's at the very back of the appendix. Other forms where the evaluators had not found those four things establishable from the documents that were submitted. In this case, you had to both textually explain why the technology was integral and you had to attach the entire contract. And so each project had voluminous documentation. And so the evaluators were looking at it to see if it was over five years, if it was over one year, if it was integral, and if it was over one million. To follow up your discussions you were having with the chief, you're saying you could not have gone to the procuring contracting officer, in other words, the person running this procurement and said, you couldn't have gone to them and said, look, we're having a problem because these two people, one hasn't responded and the other won't give us a signature. You weren't, that was not a possibility under the scenario? I mean, frankly, I suppose they could have tried that. I mean, obviously, they didn't have counsel at that point. But the government had been very clear, and it's not an ambiguous requirement. So they did what I think any reasonable contractor would do, which is just continue to try up until the moment they had to submit that bid. What about the contract provision says, well, no, I'm sorry, this isn't the contract provision. I think this is the cited in the Court of Federal Claims decision answers, and this is at Appendix 10. One response was, in regard to this question about the signature says, no, a current contracting officer, contracting officer representative, or other cognizant official with cognizance over the project needs to sign. So that suggests if the contracting officer is deceased or can't sign or won't sign, you can go to the COR and then someone with cognizance. Was there any effort made to sort of step down the line, if you will, and try and get someone else beyond the contracting officers? There was a series of, they were fairly desperate at the right before bid submissions. Yes, they were sending emails to sort of a wide audience. But what the provision says is if access to the CO is unattainable. In this case, the COs were like, we're just not going to sign the forms. So I don't know that going around them, you also had to notify the COR. It's clear they wanted the CO to be the primary person, because you had to email the COR if, I'm sorry, the CO, if you were going to bypass that person. And so in this case, there really wasn't much hope in doing that since the COs had submission. What do you understand to mean if there wasn't the CO or the COR says another, or other recognized official with cognizance, who would that be? I suppose maybe if those people had died or, you know, were simply. This isn't in the procurement. This is an answers pre-bid, if you will, but I would just, okay. Right, right. So in this case, the straightforward avenue of getting the COs signature was just foreclosed. And so SYNTEC did not try to hide the ball. They submitted all of that information and that was part of its bid. What about the, I mean, you talked about fairness earlier and how they required to operate fairly. What about the, I think it was one of the court of claims rationales for doing what he did, was that how unfair it would be to the other bidders. Yes. Because a lot of them, we don't know, but it could be the number of bidders who were unable to successfully and timely obtain the CO signatures, just didn't submit those projects because this is an uncertain environment and they knew what the rules were. So how do you? I have several responses to that. First, there's absolutely no evidence that there were any other bidders that had that. There's no record evidence that indicates that occurred. Secondly, that concern is also completely inconsistent with what the government did in this procurement with the form JP-5s. JP-5s were very similar forms that related to past performance. It also had a signature requirement. And the government ended up waiving that signature requirement in that case without form. And they did so because there wasn't really a sufficient reason or justification or need for that to happen there. So you're saying we should just assume that anyone similarly situated to you would have gone forward as you did and tried to get past that? Yes. And they've already acted inconsistently with that concern because by waiving the JP-5 requirement, there could have been... Well, there are reasons why the JP... I mean, they have reasons why the JP-5 and the JP-3 are different. Are different, yes. But that's always a concern as well with clarifications. Anytime a clarification is sought, you know, there could potentially be somebody else that, you know, we don't know the facts about. But as I said, there's no indication that there were any other bidders that had the same issue in this case. Okay. Why don't you reserve the remainder of your time and we'll get to the government. Thank you. May it please the Court, Per Arcelef is dispositive. Mr. Hussain, let me ask you something. In looking at your brief, I'm getting to the argument point, okay? Pages 16 through 23, I guess it basically addressed the Per Arcelef agreement saying this isn't timely, correct? Yes. And then at pages 24 through 26, you say, I think quite correctly, that the signature requirement was reasonable. This is 24 through 26, okay? Yes, Your Honor. And I agree. But I don't see anywhere in your brief where you really argue the abuse of discretion issue, which seems to be key here because the other side isn't challenging. They're saying this was a reasonable contract provision. They're not saying it was improperly in the procurement. And what do you have to say about the arguments that Ms. McMahon has been making? Because that's what I think the key is. Well, the primary argument that Sentech is making is that it was an abuse of discretion not to seek clarification and relying on level three and very similar cases. And this is simply not a clarification case. This is absolutely the case of an unambiguous requirement that the government, again, reiterated was unambiguous and would be adhered to. Cases like level three involved clerical errors. And the court said, well, it was an abuse of discretion for the agency not to seek clarification of an obvious clerical error. Let me ask you, suppose in this situation, Ben, the contracts that Sentech was seeking to have qualified here, where they couldn't get singers, supposing they had been GSA contracts. GSA is a very large place. I believe that you're saying under that circumstance, it still wouldn't have been necessary for the contracting officer to inquire. At that point, it would have been unfair to all the other bidders as the trial court made clear. No, but just saying, leaving that aside for the moment, if they had come in and said, we have these two GSA contracts that were LET situations and the contracting officer was Mr. X or Ms. Y down the hall here, but we can't get their signatures. Under those circumstances, are you saying there shouldn't have been any inquiry? I think that Sentech would have a better case, but adhering to the plain language of the solicitation, especially when there's a large number of bidders that need to be corralled and wrangled, would take precedence over having a separate rule for GSA contracts. What if the contracting officer here, the GSA procuring official, personally knew the two alleged contracting officers on the other procurements? I think it would be the same answer. And once again, it would be the fairness to other bidders. And we have to keep in mind here that the- What about Ms. McMahon's argument? She says, and she and the chief discussed this a bit, she would say, well, anybody could have come in if they had the same problem and made the same protest. Well, first of all, nobody made the protest before the deadline for submitting bids, and Sentech had the opportunity to do that. It had gone 10 months. To protest the unambiguous requirement. Could they have come in to the contracting officer? Was it an option for them to come in and say, look, we understand this is a proper requirement, it's reasonable, we don't challenge it, but we've gone to these two folks and we can't get the answers. What can we do? Could they have come to the contracting officer before the deadline for submission of proposals and said that? No, especially in this case where- No, because you're talking about, we're talking about whether they challenged the solicitation. So, in any event, they would have been untimely. They were on notice that that would not have mattered. I mean, the words that the contracting officer used could not have been more unequivocal that LET certifications always require a contracting officer, a contracting officer representative signature. A completed attachment JP3 with a signature is always required, no exceptions. So, you're saying even if they'd come and said we can't get these signatures, that wouldn't have been enough? Especially after having previously notified all other bidders that there would be no exceptions. Then, the bidder comes in and asks, well, what about my special case? I need an exception. What about, one final question, then I'll turn you over to my colleagues. What would be the situation if, tragically, these two contracting officers died? Well, as you noted previously, the requirement wasn't just for a contracting officer. It could have been a COR or other individual who was cognizant. So, the bidders had opportunities. And although, in that situation, if they learned that the two key individuals were deceased, the bidder could have gone to the agency and said we have this form. The contracting officer is deceased. There's no contracting officer around. Please have a cognizant party do it. Is that what you're saying? Exactly, and agencies are still presumed to act in good faith, and there's no evidence of bad faith on the part of. Wait, what does that mean? So, nobody there knows anything about this contract and wasn't there at the time, and they're still required. That's gonna take more time, right, for them to verify this stuff? Yes, but an agency is presumed to act in good faith and would generally make an effort. So, what about the response that they got from one of the contracting officers? Well, the response that, as we understand it, from one contracting officer was that he was unable to verify that this was actual leading edge technology as defined in this particular solicitation that was integral to the performance of the project. And that's a very important element of experience that's necessary for GSA, especially with these leading edge services that it was procuring. So, you're saying that happens all the time if what they're asking for doesn't match what the government agency originally had. There might be instances where the government just says, we just can't verify it, we don't know enough about it, or the details aren't spot on enough. So, is that what you're describing what happened in this circumstance? That's what it appears, and you can ask Ms. McMahon more, but it's the question, backing up, the whole point of the verification requirement was the government would receive up to thousands upon thousands of past contracts. And some of those would appear to involve leading edge technologies that were integral to the project as required in the solicitation. But the most important step here was that someone actually cognizant with the performance of that contract would step up and say, yes, I will verify that this project met the criteria to be a leading edge project. Because it takes the burden off the government of having to do that as part of the procurement process, right, I mean, you're talking about hundreds, thousands of potential contracts. Well, yes, there are 170 bidders, and each were allowed to submit up to 30. And not only that, I mean, this RFP contains two provisions, one pertinent to contracting officers and government contracts, and one pertinent to non-government commercial projects, which would qualify as LATs also. So, and the language is identical. So, I mean, I think many of us up here are sort of a little bit bothered by the fact that it was the government that didn't sign it, the contracting officers. But the problem here for me about going that way is that this RFP contains identical provisions for government and non-government. Both of them are even bolded on 1006 and 1007, must be signed. So I don't see how we could make an exception or force you to make an exception just because it happens to have been a government contract, unless we were likewise going to make an exception any time somebody submitted a non-government commercial contract, which wasn't signed by any corporate officer for the company they had the agreement with. Does that seem fair to you? That seems absolutely fair. We agree 100%. This is not just a government problem, because these contracts can come from anybody and anywhere, and that would be an awful lot of a burden to put on the government to have to verify it. It seems like, I don't know, I'm just troubled by the idea since the language is identical between the two of them that we should hold against, in this case, against the RFP and the contract, the fact that it was a government agent that didn't sign it. Right. And we agree, and we also note that with the 30 projects at 300 points each, you're still only talking about 9,000 points out of a total 83,000 possible points. So... Well, that's not such a great argument. That's actually 11%. But so, don't make that argument. Move on. I won't make that argument. If the court has no further questions, we respectfully request that the court affirm. I'd like to begin by addressing the point that you just made about the corporate and non-corporate. And I agree, it shouldn't make a difference. What makes a difference is, in this case, the evidence was submitted of the effort that had been made. So, if the effort had been made with a private company, and somebody at a private company simply refused to sign a form, I would say the same rule should apply. What you need to look at is the particular facts of this case and understand if, in the particular facts of this case, the government's inaction and refusal to take any action at all is reasonable. See, I don't buy the argument you just made. And the reason I don't buy it is because these RFPs contain a million different conditions. And this makes it absolutely clear. It's in bold, it's underlined in parts. It has to be signed, because the government didn't want to deal with the hassle of having to do its own verifications. It wanted you all to have to provide that verification. And if your response to me is yes, but there ought to be a rule in all of government contracting that whenever someone can't comply with a required provision of the RFP, it should be enough if they show they tried really hard. I'm not a trophy-for-all-participants kind of gal. I understand that concern. And Sentek's argument is simply that in the particular facts of this case, where the government had itself evaluated the contract and found that the technology was integral, it itself checked that box on its evaluation form. So the signature requirement in this case did not advance the analysis any. The government had already made the findings and had been able to make those findings. Ms. McMahon, let me ask you, the problem here was with respect to the Air Force and the DOT contract. Was there any effort made by Sentek to reach out to other past contractors? Or not contractors, but clients, if you will. Oh yeah, I mean, we submitted, there were 21 qualifying projects. And so we didn't have any, the client didn't have any problem getting the verifications on the other option. No, but I'm saying when you ran into a problem with these two people, the Air Force and the DOT contract, did Sentek think, okay, we're having problems here, let's go down the road to contract X and contract Y that we had with HUD or with? I'm not certain there were other qualifying contracts because it was a very particular, it had to be over one million, it had to be within the five years. So it may have been a case, I simply don't know, but my guess is it may have been a case that there were not those kind of contracts that would have qualified that were available. For me, the problem with your argument is, well, the government was able to verify anyway, is that then it sounds like you were making a direct assault challenge onto the signature requirement. And that would run you into the waiver problem under blue and gold. I don't think you're in the waiver problem with blue and gold, as long as we steer clear of this being a direct challenge to the signature requirement. When you're telling me, your response to me was, well, they could have figured it out from the information they had. In fact, they kind of did already. Therefore, the signature shouldn't have been required. That's the argument you just made to me. That's a direct challenge to the signature requirement in the RFP, that's waived under blue and gold. I would agree that the direct challenge is waived, without a doubt. But what we are challenging is the evaluation, what was not done during the evaluation process. And this could have been very simply addressed. And opposing counsel said this is not a clarification case. But if you look at the cases that we cited on clarifications, I think those are very instructive. One of them involved an error in a route map that was mismatched with what the text said. And the other involved a copying error. One page was copied twice, and so they didn't have qualifying past performance. And so on its face, those were problems. But what the court said is that in those situations, in those particular facts, it was unreasonable for the government not to do something. The burden on the government in this case was very minimal. We're not asking for verification, we're not asking for an establishment of a rule that would require thousands of contracts to be verified. What we think is reasonable is that when presented with evidence that the contracting officers, or whomever, simply refused to sign a form, and when the government had been able to verify all the substantive factors. Your problem is you just say what we think is reasonable. What's my standard of review here? De Novo, you. No, abuse of discretion. My standard of review is, that's not De Novo, that's abuse of discretion. So what you think is reasonable, which is a fact question, isn't gonna get you over the hurdle of whether they abuse their discretion. Right, the ultimate standard that you're applying absolutely is abuse of discretion. And the lack of government action can constitute abuse of discretion. And so that's what this protest is challenging, the lack of action during evaluation. Thank you. Thank you, thank both sides on the case.